IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 20, 2019

**STATE OF TENNESSEE v. SHANNON JAMES KEENER**

**Appeal from the Criminal Court for Davidson County**
**No. 2017-A-469     Steve Dozier, Judge**

_____

**No. M2018-00730-CCA-R3-CD**

_____

The Appellant, Shannon James Keener, pled guilty in the Davidson County Criminal Court to rape and received a ten-year sentence to be served in confinement. On appeal, the Appellant claims that his sentence is excessive and that the trial court erred by refusing to grant his request for alternative sentencing. Based upon our review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Jeffrey A. DeVasher (on appeal) and C. Dawn Deaner and Georgia Sims (at hearings), Nashville, Tennessee, for the appellant, Shannon James Keener.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glen R. Funk, District Attorney General; and Jenny Charles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In March 2017, the Davidson County Grand Jury indicted the Appellant for two counts of rape of a child, a Class A felony. The indictment alleged that the offenses occurred between April 1, 2013, and May 20, 2014. On December 7, 2017, the Appellant pled guilty to one count of rape without consent, a Class B felony. At the plea hearing, the State gave the following factual account of the crime:

[I]n June 2013 Shannon Keener moved into Mr. [R.A.]'s home located at 801 Saxty Lake Drive (phonetic) in Davidson County, Tennessee.[1]  The two men began a romantic relationship, and Mr. [R.A.]'s adopted son, [A.A.,] was eight years of age when Mr. Keener moved into the home.  [A.A.] has been diagnosed as having Dup15q syndrome rendering him with [severe] developmental disabilities and he is on the autism spectrum.

One morning in May of 2014, [A.A.] asked his father [R.A.] if he was going to, quote, "suck on his wee wee the way Shannon did".  Mr. [R.A.] confronted Mr. Keener about the statement and Mr. Keener denied any wrong doing.  Shortly thereafter, Mr. [R.A.] ended the relationship with Mr. Keener and Mr. Keener moved out of the residence.  After moving out, Mr. Keener left Mr. [R.A.] a card stating, quote, "you know all of this is not true".

On May 27th, of 2014, Mr. [R.A.] called the Department of Children's Services and he took [A.A.] to get a forensic interview at the Nashville Children's Alliance on June 6th, of 2014.  Forensic interviewer Lilly Kennedy noted in a summary that [A.A.] denied that someone ever touched his penis, but when he was asked if someone asked him to keep a secret, he quote visibly shut down started sucking on his arm and rocking back and forth.

On June 13th of 2014, [A.A.]'s regular babysitter by the name of Erica Brobrige (phonetic), was watching him and she reported that [A.A.] told her, quote, "Shannon pulled [A.A.]'s pants down and put his mouth on his private parts. He said Shannon told him it was a secret".  She said that [A.A.] told her that occurred one time and then he told her Mr. Keener's private parts were larger than his own.  [A.A.] disclosed to her that Mr. Keener made him put his mouth on Mr. Keener's private parts.  And when she asked him if it occurred once or a lot, he said a lot.

On July 27th, of 2014, Mr. Keener drove to Murfreesboro where he was arrested on the side of the

---

[1] In order to protect the minor victim's identity, we will refer to him and his parents by their initials.

interstate. A suicide note and a yellow notebook was located in the car in which Mr. Keener was driving. The note was written by Mr. Keener. In the letter Mr. Keener admits to molesting [A.A.] and says, quote, "I am a thief, liar, rapist, child molester and cheater. I take and take but never give".

On November 23rd of 2016, a second forensic interview was done at the Nashville Children's Alliance. [A.A.] stated to forensic interviewer Barbara Talen that Mr. Keener bend his head over his own private part and quote started sucking like a baby. Mr. Keener wanted [A.A.] to suck his private part. [A.A.] told Ms. Talen he did not want to. Mr. Keener shoved his head down. [A.A.] reported to Ms. Talen that it happened quote a bunch. [A.A.] also reported to Ms. Talen that Mr. Keener told him not to tell anyone.

Pursuant to the plea agreement, the trial court was to determine the length and manner of service of the sentence.

At the outset of the sentencing hearing, the State introduced the Appellant's presentence report into evidence. According to the report, the Appellant dropped out of a Knoxville high school after the ninth grade in order to take care of his mother, who was ill. He obtained his GED in 2006 and completed the Certified Nursing Technology program at Tennessee Technology Center. The Appellant stated in the report that he had a history of depression and that he became depressed when his relationship with R.A. ended in May 2014. He said that he attempted suicide twice but received inpatient counseling for a few days and that suicide was "no longer an issue" for him. He described his mental health as "excellent." The Appellant said in the report that he began consuming alcohol when he was twenty-one years old and "drank to excess" but that he had been sober since his arrest on July 27, 2014. The Appellant described his physical health as "good" and did not report any problems. The report showed that the Appellant worked as a hospice aid for Caris Healthcare from June 2012 to July 2014, that he began working at Burger King in June 2015, and that he was still working at Burger King at the time of the sentencing hearing. According to the report, the Appellant was convicted of misdemeanor theft in October 2013 and received a sentence of eleven months, twenty-nine days. The trial court granted judicial diversion and place him on probation. The Appellant also had convictions for two counts of aggravated assault, one count of unlawful possession of a weapon, and one count of driving while impaired. The four convictions resulted from an incident on July 27, 2014, in which the Appellant entered R.A.'s home while the victim was present, threatened to kill R.A., and put a gun to R.A.'s brother's head. In March 2015, the Appellant received an effective five-year sentence to be served on community corrections.

R.A. testified for the State that the victim was born in July 2004. R.A. was married at that time, and he and his wife, M.C., adopted the victim when the victim was two weeks old. R.A. and M.C. divorced in 2013, and the victim primarily lived with R.A. The Appellant moved in with R.A. in June or July 2013. R.A. said that he trusted the Appellant to be alone with the victim and that the Appellant would "watch" the victim while R.A. was at work. The State asked if the Appellant also dressed and bathed the victim, and R.A. answered, "He has before." R.A. said that the Appellant's crime "pretty well devastated" the victim, that the victim went "through a lot of therapy," and that "[i]t's been a hard road." On cross-examination, R.A. testified that the Appellant volunteered to look after the victim while R.A. was at work so that R.A. could save money on babysitters.

M.C., the victim's mother, testified that the victim was thirteen years old at the time of the sentencing hearing. The victim was diagnosed with dup15q syndrome, a genetic chromosomal disorder, when he was ten or eleven years old. The victim began to speak when he was three years old, but he still had problems with verbal communication and could not tie his shoes or ride a bike. M.C. said that the Appellant's crime affected her and the victim "tremendously" and that her heart was "broken." She stated, "Basically a person I've never met in my life or known has ruined my life." On cross-examination, M.C. testified that the victim also had a form of autism, that he was "on a first grade level," and that he received speech and communication therapy.

Officer Brad Brown of the Lenoir City Police Department testified that he investigated a case of identity theft and check forgery. The case involved a check written in the amount of $772.73 and purportedly signed by Faith Dale on November 14, 2016. Officer Brown obtained a "still shot" that was taken by a surveillance camera at the TVA Credit Union's Turnkey Creek Branch on November 14, 2016, and developed the Appellant as a suspect. Officer Brown tried to talk with the Appellant about the check, but the Appellant requested legal counsel, so Officer Brown stopped speaking with him. However, Officer Brown showed the Appellant a copy of the check. The Appellant "didn't try to deny anything" and "[j]ust seemed to accept it and go on." On February 22, 2017, the case against the Appellant was dismissed upon the Appellant's payment of $772.73. The State introduced into evidence a copy of a Loudon County judgment, showing that the Appellant was charged with criminal simulation and that the charge was dismissed upon his payment of $772.73 in restitution.

On cross-examination, Officer Brown acknowledged that he arrested the Appellant and brought him to the police department. Officer Brown tried to question the Appellant, but the Appellant requested counsel, so Officer Brown stopped the interview. Officer Brown said he then showed the Appellant the bank photograph and a copy of the check "to let him know what I had and that we were placing him in custody." The Appellant

did not say anything and "just shook his head." Officer Brown said that check was in the Appellant's mailbox because the Appellant was living at Faith Dale's previous address.

Dr. Steven Montgomery testified for the Appellant as an expert in the administration of psychosexual evaluations. Dr. Montgomery, a forensic psychiatrist at Vanderbilt University Medical Center, performed a psychosexual risk assessment of the Appellant and found him to be "open and honest" during the evaluation. However, the Appellant's version of the events differed from the victim's version in that the Appellant claimed the victim's father was involved.

Dr. Montgomery testified that he used the Able Assessment for Sexual Interest (AASI) to evaluate the Appellant. The assessment included a computerized test in which the Appellant was shown 160 photographs of Caucasian and African-American males and females in four age categories: preschool, grade school, adolescent, and adult. The Appellant then rated each slide on scale of one to seven with a score of one being no interest and a score of seven being high interest, and the test measured his visual reaction time to the images. The Appellant showed a sexual interest in Caucasian adult males and African-American males age five or less, African-American females age five or less, African-American adult females, and African-American adult males. Dr. Montgomery said the Appellant's scores were unexpected for his own race group, Caucasian, because the Appellant did not manifest any sexual interest in Caucasian children. The Appellant scored in the medium risk group for recidivism, meaning that his risk to reoffend was one percent at one year, four percent at five years, seven percent at ten years, and ten percent at fifteen years.

Dr. Montgomery testified that he also scored the Appellant on the Static-99, an assessment for recidivism, based on the Appellant's history. The Appellant scored four points, which put him in the above average risk category. The Appellant received one point for his age, one point for having a conviction for a violent offense, one point for being unrelated to the victim, and one point because the victim was male. Dr. Montgomery explained that when the Appellant's age increased to thirty-five in two years, the Appellant's score would drop to three points, putting him in the average risk category. Dr. Montgomery stated that the recidivism rate for people in the above average risk category was eleven percent at five years and that the recidivism rate for people in the average risk category was eight percent at five years. Dr. Montgomery recommended that the Appellant receive sex offender treatment, abstain from using alcohol and drugs, and resume psychiatric treatment if he experienced further episodes of depression.

On cross-examination, Dr. Montgomery testified that the Appellant claimed he never had any sexual attraction to children, which was inconsistent with results of the Abel Assessment. The Appellant also claimed he engaged in child molestation "one time with one victim," which was inconsistent with the victim's claim that the victim was forced to engage in oral sex with the Appellant multiple times. Dr. Montgomery said that

while the Appellant acknowledged the wrongfulness of his behavior with the victim, the Appellant "still may have some distortions relating to the reason that it happened with the other person being cooperating or being a [co-offender] or things about the victim being sexually inappropriate or precocious or that kind of thing." In the Appellant's view, the victim's father was "a [co-offender]" or "somehow facilitate[ed] what was going on," and the Appellant went along with the inappropriate conduct because he did not want to lose his relationship with the victim's father.

Dr. Jessica Duis, an Assistant Professor of Pediatrics and a pediatric geneticist at Vanderbilt Children's Hospital, testified for the State that the victim was born with "15q duplication syndrome," meaning that "[A.A] has an extra piece of chromosome 15." The condition could not be treated or cured and resulted in autism and developmental delays. Dr. Duis stated that the victim's speech was delayed and that he "doesn't relate to people in the way that normal people do." The victim was unable to think abstractly, "so . . . if someone tells him to do something, he would do it. He doesn't have any room to understand sarcasm or joking." The victim's delays were present since birth, and school testing showed he had an IQ of fifty-three, meaning he was "severely [a]ffected intellectually."

On cross-examination, Dr. Duis testified that she took over the victim's care from a colleague who left Vanderbilt, and she acknowledged that she met with the victim only one time for one hour. Although children with 15q duplication syndrome were delayed since birth, most parents did not notice the delays until the children were six months old. Children usually were not diagnosed with the condition until they were two or three years old.

Marty McKee was called to testify by the State. The State showed McKee a letter he wrote to the trial court on behalf of the Appellant, and McKee said he wrote the letter from a template provided to him by the Appellant. The Appellant obtained the template from defense counsel and emailed the template to McKee and other people. McKee explained, "They said use it as a guide to fill in the blanks. Because we didn't want it to be all over the place, so that's what we did." McKee acknowledged that the following sentence in his letter came from the template: "I ask Your Honor to exercise compassion in sentencing him."

On cross-examination, McKee testified that he agreed with what was stated in the letter. He said that if he had disagreed with something in the letter, he would have changed it or omitted it. The Appellant did not coerce him into signing the letter. At the conclusion of McKee's testimony, defense counsel introduced into evidence nine letters, including McKee's letter, written on the Appellant's behalf.

The Appellant read a statement to the trial court. In the statement, the Appellant said he currently lived in Lenoir City, that he worked as the General Manager of a Burger

King in Alcoa, and that the Alcoa restaurant was "one of the busiest" in the franchise. He said that he was not using alcohol or drugs and that he had "no desire to ever come back to Nashville or be around the victim or the victim's family." The Appellant apologized to R.A. and A.A. "for what I have done" and said that "[m]y biggest regret in life was the day I moved to Nashville." The Appellant stated that he took "full responsibility" for his crime and requested that he serve his sentence in community corrections.

The trial court found the following enhancement factors applicable to the Appellant's sentence: (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range"; (4), that the "victim of the offense was particularly vulnerable because of age or physical or mental disability"; and (14), that the defendant abused a position of public or private trust. Tenn. Code Ann. § 40-35-114(1), (4), (14). In mitigation, the trial court applied factor (13), the "catch-all" provision, for the Appellant's "lack of record." See Tenn. Code Ann. § 40-35-113(13). The trial court sentenced the Appellant to ten years, the midpoint in the range for a Range I offender convicted of a Class B felony. See Tenn. Code Ann. § 40-35-112(a)(2). The trial court stated that the Appellant had done well in community corrections but found that alternative sentencing was inappropriate in this case, stating,

> [W]hat message is that sending to Mr. Keener or the young child or anyone else in Lenoir City or Davidson County if a rape of a child lands a person on community corrections? I'm not saying that couldn't happen, [I] just don't think it's the right thing to do factually in this particular situation.

Accordingly, the trial court ordered that the Appellant serve his ten-year sentence in confinement.

## II. Analysis

### A. Excessive Sentence

The Appellant claims that his sentence is excessive because the trial court misapplied enhancement and mitigating factors. The State argues that the trial court properly sentenced the Appellant. We agree with the State.

"[S]entences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In sentencing a defendant, the trial court shall consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and

characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on an appellant to demonstrate the impropriety of the sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

Regarding the trial court's application of enhancement factors, the Appellant claims that the trial court erred by applying factor (1) for his previous history of criminal convictions because he did not have any convictions at the time of the offense, four of his five prior convictions occurred during a single episode on July 27, 2014, and three of the five convictions were misdemeanors. However, as noted by the Appellant, trial courts "'can consider criminal convictions or any other criminal behavior which occurred prior to the sentencing hearing as being "a previous history of criminal convictions or criminal behavior" . . . regardless of whether the convictions or behavior occurred before or after the criminal conduct under consideration.'" State v. Jordan, 116 S.W.3d 8, 24 (Tenn. Crim. App. 2003) (quoting State v. Ed Waters, No. 01-C-01-9106-CR-00158, 1992 WL 28457, at *3 (Tenn. Crim. App. at Nashville, Feb. 20, 1992)). The Appellant had multiple prior convictions at the time of sentencing, two of which were for violent felonies involving the victim's family. State v. Birge, 792 S.W.2d 723, 725 (Tenn. Crim. App. 1995) (stating that aggravated assault is a violent crime). Therefore, the trial court properly applied enhancement factor (1).

The Appellant contends that the trial court erred by applying enhancement factor (4), that the victim was particularly vulnerable because of age or physical or mental disability, because the proof did not show that he took advantage of the victim's age or physical or mental disability during the commission of the crime. We disagree with the Appellant. The victim was approximately nine years old at the time of the offense, and he was born with a genetic syndrome that caused him to be severely intellectually and developmentally delayed from birth. He also was autistic. In applying this factor, the trial court noted that the victim had an IQ of only fifty-three and received therapy for his communication skills. At the time of the sentencing hearing, the victim was thirteen years old but still could not tie his shoes or ride a bike. Thus, we have no hesitation in concluding that the trial court properly applied enhancement factor (4).

The Appellant also contends that the trial court erred by applying enhancement factor (14), that he abused a position of public or private trust, because the proof did not establish the existence of a relationship that promoted confidence, reliability, or faith and did not show that the offense occurred while he was acting as the victim's caretaker. Again, we disagree with the Appellant. Our supreme court has explained that a "court must look to 'the nature of the relationship,' and whether that relationship 'promoted

confidence, reliability, or faith.' A relationship which promotes confidence, reliability, or faith, usually includes a degree of vulnerability." State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn.1999) (quoting State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996)). Notably,

> [t]he position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith.

Kissinger, 922 S.W.2d at 488. Here, the Appellant was in a romantic relationship with the victim's father and lived with the victim's father and the victim for a year. During that time, the Appellant served as the victim's caretaker while the victim's father was at work. He even bathed and dressed the victim. Thus, we also have no hesitation in concluding that the trial court properly applied enhancement factor (14).

Next, the Appellant claims that the trial court should have applied mitigating factor (11), that "[t]he defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct," to his sentence because he became clinically depressed "[a]t or about the time of the offense," attempted suicide twice, and was abusing alcohol. See Tenn. Code Ann. § 40-35-113(11). The trial court specifically addressed this factor, stating that "these circumstances aren't such that that mitigating factor would apply." We agree with the trial court. We note that the Appellant stated in the presentence report that he became depressed when his relationship with R.A. ended in May 2014. Thus, the evidence does not support his claim that he was depressed at the time of the offense, which occurred before the relationship ended. In any event, regardless of when the Appellant became depressed, we conclude that the trial court properly refused to apply mitigating factor (11).

The Appellant also contends that the trial court erred by refusing to mitigate his sentence under mitigating factor (13), the "catch-all" provision, based upon his being an "exceptional employee in a management position"; his expression of remorse; and his rehabilitation, which he has "shown through his exemplary performance on community corrections."

As to the Appellant's potential for rehabilitation, Dr. Montgomery's testimony established that the Appellant's version of the events differed from the victim's version in that the Appellant claimed the victim's father was involved; the Appellant claimed he did not have a sexual attraction to children, which was inconsistent with the results of the Abel Assessment; the Appellant claimed he engaged in child molestation only one time

with only one victim, which was inconsistent with the victim's claim that he was forced to engage in oral sex with the Appellant multiple times; and the Appellant had "distortions" about his abuse of the victim. Moreover, the Appellant scored in the medium risk group for recidivism on the Abel Assessment and in the above average risk category for recidivism on the Static-99. In our view, the Appellant lacks potential for rehabilitation.

As to the Appellant's employment history, this court has held that employment history should be considered favorably in sentencing. See State v. Kelley, 34 S.W.3d 471, 482-83 (Tenn. Crim. App. 2000). Likewise, genuine remorse may be entitled to consideration. See State v. Williamson, 919 S.W.2d 69, 83 (Tenn. Crim. App. 1995). However, neither are statutory factors under Tennessee Code Annotated section 40-35-113. "[I]t is left to the sound discretion of the trial court whether to apply the so-called 'catch-all' provision of section 40-35-113(13)." State v. Robert Allen Zaloba, No. M2011-00855-CCA-R3-CD, 2012 WL 6690027, at *25 (Tenn. Crim. App. at Nashville, Dec. 26, 2012). We conclude that the trial court did not abuse its discretion by refusing to apply mitigating factor (13) for the Appellant's employment history and remorse. Regardless, as our supreme court has explained, a trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed. . . . So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Bise, 380 S.W.3d at 706. In this case, the trial court properly applied enhancement factors (1), (4), and (14). Therefore, we conclude that the trial court did not abuse its discretion in determining the length of the Appellant's sentence.

## B. Alternative Sentencing

Finally, the Appellant contends that the trial court erred by denying his request for alternative sentencing because the record demonstrates that he is an excellent candidate for rehabilitation, does not have an extensive criminal history, has expressed sincere remorse, is a valued employee in a supervisory role, has performed well in community corrections, and is not at a high risk to reoffend. The State argues that the trial court properly ordered the Appellant to serve his ten-year sentence in confinement. We agree with the State.

An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). Tennessee Code Annotated section 40-35-103(1) sets forth the following sentencing considerations which are utilized in determining the appropriateness of alternative sentencing:

(A)   Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B)   Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C)   Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

See also State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996).  Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed."  Tenn. Code Ann. § 40-35-103(5).  A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing.  Tenn. Code Ann. § 40-35-102(5).  Our supreme court has specifically held that the abuse of discretion standard, with a presumption of reasonableness, also applies to a review of a denial of alternative sentencing.  State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

Initially, we note that while the Appellant is eligible for alternative sentencing because his sentence is ten years, he is not considered to be a favorable candidate for alternative sentencing because rape is a Class B felony.  In addition, we have already expressed our concerns about the Appellant's lack of potential for rehabilitation.  The trial court's comments demonstrate that it found that confinement was necessary to avoid depreciating the seriousness of the offense.  In denying alternative sentencing on that basis, the criminal act should be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree.  Zeolia, 928 S.W.2d at 462.  The circumstances here, in which the Appellant forced a mentally disabled nine-year-old child to engage in oral sex when the Appellant was supposed to be that child's caretaker, are indeed shocking and reprehensible.  Thus, we conclude that the trial court did not abuse its discretion by denying alternative sentencing.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE